Court of Common Pleas, Mahoning County
120 Market Street
Youngstown, Ohio 44503

# SUMMONS ON COMPLAINT
Rule 4 Ohio Rules of Civil Procedure

------========*========------

Case No. 2021 CV 01168

VANESSA GARLTIC     -vs-     GL INTL LLC
164 PROSPECT ST.                DBA GLI POOL PRODUCTS
STRUTHERS, OH 44471       215 SINTER COURT
                                                  YOUNGSTOWN, OH 44510

TO: **GL INTL LLC**

                          **DBA GLI POOL PRODUCTS**
                          **215 SINTER COURT**
                          **YOUNGSTOWN, OH 44510**

    Defendant

To the above named defendant(s): (See attached complaint for additional parties)

     You are hereby summoned that a complaint (a copy of which is hereto attached and made a part hereof) has been filed against you in this court by the plaintiff(s) named herein.

     You are required to serve upon the plaintiff('s') attorney, or upon the plaintiff(s) if he/she/they has/have no attorney of record, a copy of your answer to the complaint within 28 days after service of this summons upon you, exclusive of the day of service. Said answer must be filed with this court within three (3) days after service on plaintiff(s) attorney.

     The name and address of the plaintiff('s') attorney is as follows:

                   BRIAN D SPITZ
                   THE WATERTOWER PLAZA
                   25200 CHAGRIN BOULEVARD, SUITE 200
                   BEACHWOOD OH 44122

     If you fail to appear and defend, judgment by default will be taken against you for the relief demanded in the complaint.

                                                                        ANTHONY VIVO
                                                     Mahoning County Clerk of Courts

                                                                        July 9, 2021

                                                       By: N. Dascenzo
                                                                  Deputy Clerk


EXHIBIT A

Summons issued to additional defendants:

GL INTL LLC

ELECTRONICALLY FILED
2021 Jul 07 PM 2:43
Anthony P. Vivo, CLERK OF COURT - MAHONING

IN THE COURT OF COMMON PLEAS
MAHONING COUNTY, OHIO

| | | |
|---|---|---|
| VANESSA GARLTIC<br>164 Prospect Street<br>Struthers, Ohio 44471 | )<br>)<br>)<br>)<br>) | CASE NO. 21 CV 1168<br><br>JUDGE: DONOFRIO |
| Plaintiff, | )<br>) | |
| v.<br>GL INTERNATIONAL, LLC<br>d/b/a GLI Pool Products<br>215 Sinter Court<br>Youngstown, Ohio 44510 | )<br>)<br>)<br>)<br>)<br>) | **COMPLAINT FOR DAMAGES AND REINSTATEMENT**<br><br>**JURY DEMAND ENDORSED HEREIN** |
| Serve also:<br>CT CORPORATION SYSTEM,<br>Statutory Agent<br>4400 Easton Commons Way, #125<br>Columbus, Ohio 43219 | )<br>)<br>)<br>)<br>) | |
| Defendant. | ) | |

Plaintiff, Vanessa Garltic, by and through undersigned counsel, as her Complaint against the Defendants, states and avers the following:

## PARTIES & VENUE

1. Garltic is a resident of the city of Struthers, county of Mahoning, state of Ohio.

2. GL International, LLC, Inc. ("GLI") is a foreign limited liability company that owns and/or operates a business in Ohio located at 215 Sinter Court, Youngstown, Ohio 44510.

3. GLI operates under the fictitious name "GLI Pool Products."

4. All material events alleged in this Complaint occurred in county of Mahoning.

5. Personal jurisdiction is proper over GLI pursuant to R.C. § 2307.382(A)(1) and (4).

6. Venue is proper pursuant to Civ. R. 3(C)(3) and (6).



7. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

8. Garltic is a former employee of GLI.

9. Garltic began working for GLI in or around October 2016

10. Garltic began working for GLI as a RF Operator.

11. In or around October 2019, Garltic was promoted to a Coordinator position at GLI.

12. In or around January 2020, Garltic was promoted to a Production Lead position at GLI.

13. Beginning in or around March 2020, due to the emerging COVID-19 pandemic, non-essential businesses began closing or transitioning to remote work.

14. On or around March 12, 2020, the Ohio Department of Health issued an order to avoid mass-gatherings. ("No Mass-Gathering Order")

15. In the No Mass-Gathering Order, the Ohio Department of Health urged individuals to:

    [M]aintain social distancing (approximately six feet away from other people) whenever possible and to continue to wash hands, utilize hand sanitizer and practice proper respiratory etiquette (coughing into elbow, etc.)

16. On or around March 22, 2020, the Ohio Department of Health issued a stay-at-home order, requiring individuals, particularly those with COVID-19 symptoms, to self-isolate. ("Government Mandate")

17. The Government Mandate was in accordance with emergency powers granted to the Ohio Department of Health in Executive Order 2020-01D.

18. The Government Mandate ordered businesses and employers to take actions including to:

    Actively encourage sick employees to stay home until they are free of fever (without the use of medication) for at least 72 hours (three full days) AND have improved for at least 72 hours AND at least seven days have passed since first began. Do not require a healthcare provider's note to validate the illness or return to work of employees sick with acute respiratory illness; healthcare provider offices



and medical facilities may be extremely busy and not able to provide such documentation in a timely way.

19. The Government Mandate ordered businesses and employers to take actions, including to:

   Ensure that your sick leave policies are up to date, flexible, and non-punitive to allow sick employees to stay home to care for themselves, children, or other family members. Consider encouraging employees to do a self-assessment each day to check if they have any (fever, cough, or shortness of breath).

20. The Government Mandate urged at-risk individuals to take precautions regarding their health:

   People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care.

21. The Government Mandate required businesses to observe social-distancing requirements:

   Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces. and not shaking hands.

22. The Government Mandate was made pursuant to R.C. § 3701.13, which reads in part:

   The department of health shall have supervision of all matters relating to the preservation of the life and health of the people and have ultimate authority in matters of quarantine and isolation, which it may declare and enforce, when neither exists, and modify, relax, or abolish, when either has been established.

23. R.C. §3701.352 states, "No person shall violate any rule the director of health or department of health adopts or any order the director or department of health issues under this chapter to prevent a threat to the public caused by a pandemic, epidemic, or bioterrorism event."

24. Clear public policy exists if the policy was manifested in a state or federal constitution, statute, ordinance, or administrative regulation, or in the common law.

25. The Revised Code comprises state statutes.

26. There is a clear public policy in adhering to orders of the director of health or department of health.



27. From the issuance of the No Mass-Gathering Order through June 2020, there was a clear public policy that individuals adhere to social distancing and utilize sanitation products whenever possible.

28. From the issuance of the Government Mandate through June 2020, there was a clear public policy that businesses ensured that it took steps to minimize the risks associated with COVID-19.

29. From the issuance of the Government Mandate through June 2020, there was a clear public policy that those at a high risk of severe illness from COVID-19 would self-quarantine to avoid COVID-related risks.

30. From the issuance of the Government Mandate through June 2020, there was a clear public policy that businesses' sick-leave policies permitted compliance with the Government Mandate.

31. From the issuance of the Government Mandate through June 2020, there was a clear public policy that individuals suffering from fever, cough, and/or shortness of breath should self-quarantine.

32. From the issuance of the Government Mandate through June 2020, there was a clear public policy that businesses observe social distancing.

33. From the issuance of the No Mass-Gathering Order through June 2020, there was a clear public policy that individuals take measures to mitigate the spread of COVID-19.

34. Alternatively, from the issuance of the Government Mandate through June 2020, there was a clear public policy that individuals take measures to mitigate the spread of COVID-19.

35. From the issuance of the Government Mandate through June 2020, there was a clear public policy that businesses provide its employees with sanitization products.



36. Despite the No Mass-Gathering Order and Government Mandate, GLI permitted its employees to come into work while sick.

37. Despite the No Mass-Gathering Order and Government Mandate, GLI failed to implement policies, such as social distancing, to ensure workplace safety. ("Failure to Enforce Social Distancing")

38. Despite the No Mass-Gathering Order and Government Mandate, GLI failed to provide its employees with sanitization products. ("Failure to Supply Sanitization Products")

39. On or around March 2020, Garltic reported GLI's Failure to Enforce Social Distancing to the Mayor of Youngstown's Office.

40. On or around March 2020, Garltic reported GLI's Failure to Enforce Social Distancing to the Governor's Office.

41. On or around March 2020, Garltic reported GLI's Failure to Enforce Social Distancing to the Ohio Department of Health.

42. On or around March 2020, Garltic reported GLI's Failure to Supply Sanitization Products to the Mayor of Youngstown's Office.

43. On or around March 2020, Garltic reported GLI's Failure to Supply Sanitization Products to the Governor's Office.

44. On or around March 2020, Garltic reported GLI's Failure to Supply Sanitization Products to the Ohio Department of Health.

45. Garltic's actions were in line with a clear public policy when she reported GLI's Failure to Enforce Social Distancing Failure to Supply Sanitization Products. ("Reporting GLI's Unsafe COVID-19 Practices")



46. On or about March 19, 2020, Garltic was given a mass-layoff number. ("Mass-Layoff Number")

47. Under the Mass-Layoff Number, Garltic could not report to work at GLI until she was instructed to do so.

48. GLI gave Garltic the Mass-Layoff Number in retaliation for Garltic' Reporting GLI's Unsafe COVID-19 Practices.

49. In giving Garltic the Mass-Layoff Number, GLI made it less likely for employees to report unsafe COVID-19 practices.

50. Giving an employee who reported safety violations a Mass-Layoff Number would discourage a reasonable employee from reporting safety violations.

51. Giving Garltic the Mass-Layoff Number was an adverse action.

52. Giving Garltic the Mass-Layoff Number was an adverse employment action.

53. GLI willfully gave Garltic the Mass-Layoff Number.

54. GLI intentionally gave Garltic the Mass-Layoff Number.

55. On or about May 1, 2020, Maureen Last Name Unknown instructed Garltic to return to work on May 3, 2020. ("May 1, 2020 Return-to-Work Conversation")

56. In response to the May 1, 2020 Return-to-Work Conversation, Garltic told Maureen LNU that she had flu-like symptoms. ("Refusing to Work While Sick")

57. Garltic's flu-like symptoms, which prompted her Refusing to Work While Sick, included a cough.

58. Garltic's flu-like symptoms, which prompted her Refusing to Work While Sick, included a fever.



59. During the May 1, 2020 Return-to-Work Conversation, Maureen LNU told Garltic that, if Garltic did not return to work on May 3, 2020, Garltic would need to sign a voluntary-resignation form. ("May 1, 2020, Return-to-Work Ultimatum")

60. Maureen LNU did not have the authority to give Garltic the May 1, 2020, Return-to-Work Ultimatum.

61. Alternatively, Maureen LNU was given the authority by GLI to make the May 1, 2020, Return-to-Work Ultimatum.

62. GLI made the May 1, 2020, Return-to-Work Ultimatum in retaliation for Garltic's Reporting GLI's Unsafe COVID-19 Practices.

63. GLI made the May 1, 2020, Return-to-Work Ultimatum in retaliation for Garltic's Refusing to Work While Sick.

64. Alternatively, GLI made the May 1, 2020, Return-to-Work Ultimatum because Garltic took measures to prevent the spread of COVID-19.

65. Requiring an employee to choose between quarantining and his or her employment makes it less likely for a reasonable employee to report unsafe COVID-19 practices.

66. Requiring an employee to choose between quarantining and his or her employment makes it less likely for a reasonable employee to refuse to work while sick.

67. Requiring an employee to choose between quarantining and his or her employment makes it less likely for a reasonable employee to take measures to prevent the spread of COVID-19.

68. The May 1, 2020, Return-to-Work Ultimatum was an adverse action.

69. The May 1, 2020, Return-to-Work Ultimatum was an adverse employment action.

70. The May 1, 2020, Return-to-Work Ultimatum was made willfully.

71. The May 1, 2020, Return-to-Work Ultimatum was made intentionally.



72. Garltic did not return to work on May 3, 2020.

73. Garltic did not sign a voluntary-resignation form.

74. Based on the May 1, 2020, Return-to-Work Ultimatum, Garltic believed that she was terminated effective May 1, 2020.

75. On or about May 6, 2020, police officers arrived at Garltic's home to conduct a wellness check. ("May 6, 2020 Wellness Check")

76. GLI instructed the police to conduct the May 6, 2020 Wellness Check.

77. In instructing the police to conduct the May 6, 2020 Wellness Check, GLI told the police that Garltic's husband was abusing her. ("Stated Basis for Instructing the Police to Conduct the May 6, 2020 Wellness Check")

78. Garltic's husband does not abuse her.

79. The Stated Basis for Instructing the Police to Conduct the May 6, 2020 Wellness Check has no basis in fact.

80. GLI provided the Stated Basis for Instructing the Police to Conduct the May 6, 2020 Wellness Check to humiliate Garltic for not returning to work on May 3, 2020.

81. GLI instructed the police to conduct the May 6, 2020 Wellness Check in retaliation for Garltic's refusal to comply with the May 1, 2020, Return-to-Work Ultimatum.

82. GLI instructed the police to conduct the May 6, 2020 Wellness Check in retaliation for Garltic's Reporting GLI's Unsafe COVID-19 Practices.

83. GLI instructed the police to conduct the May 6, 2020 Wellness Check in retaliation for Garltic's Refusing to Work While Sick.



84. An employer's calling the police on its employees for refusing to work instead of quarantining makes it less likely for a reasonable employee to quarantine in accordance with a government order.

85. An employer's calling the police on its employees for reporting the employer's refusal to maintain a sanitary workplace makes it less likely for a reasonable employee to prevent the spread of COVID-19 in the workplace.

86. GLI's instructing the police to conduct the May 6, 2020 Wellness Check was an adverse action.

87. GLI's instructing the police to conduct the May 6, 2020 Wellness Check was an adverse employment action.

88. GLI willfully instructed the police to conduct the May 6, 2020 Wellness Check.

89. GLI intentionally instructed the police to conduct the May 6, 2020 Wellness Check.

90. During the May 6, 2020 Wellness Check, the police told Garltic to call GLI.

91. Garltic called GLI on or about May 6, 2020. ("First May 6, 2020 Phone Call")

92. During the First May 6, 2020 Phone Call, Garltic spoke to Michelle Korda.

93. Korda works in Human Resources for GLI.

94. During the First May 6, 2020 Phone Call, Korda told that Maureen LNU did not have the authority to terminate Garltic.

95. During the First May 6, 2020 Phone Call, Korda told that Maureen LNU did not have the authority to give Garltic the May 1, 2020 Return-to-Work Ultimatum.

96. By telling Garltic that Maureen LNU did not have the authority to give Garltic the May 1, 2020 Return-to-Work Ultimatum, Korda was admitting that Maureen LNU was attempting to harass Garltic.



97. During the First May 6, 2020 Phone Call, Korda told Garltic that Garltic could return to work on the following Sunday.

98. During the First May 6, 2020 Phone Call, Garltic repeated that she had flu-like symptoms.

99. During the First May 6, 2020 Phone Call, GLI told Garltic that the latest she could return to work was May 17, 2020.

100. During the First May 6, 2020 Phone Call, GLI told Garltic to get a free COVID-19 test at QuickMed. ("Free COVID Test Lie")

101. On or about May 6, 2020, QuickMed was not providing free COVID-19 testing.

102. In making the Free COVID Test Lie, GLI admitted that it instructed the police to conduct the May 6, 2020 Wellness Check because it did not believe that Garltic had flu-like symptoms.

103. When making the Free COVID Test Lie, GLI knew that QuickMed was not providing free COVID-19 testing.

104. The Free COVID Test Lie was an adverse action.

105. The Free COVID Test Lie was made willfully.

106. The Free COVID Test Lie was made intentionally.

107. After the First May 6, 2020 Phone Call, Garltic learned that QuickMed was not providing free COVID-19 testing. ("Learning about Free COVID Test Lie")

108. After Garltic's Learning about Free COVID Test Lie, on or about May 6, 2020, Garltic called GLI. ("Second May 6, 2020 Phone Call")

109. During the Second May 6, 2020 Phone Call, GLI informed Garltic that she had until May 17, 2020 to return to work, regardless of whether she had COVID-19. ("May 6, 2020 Return-to-Work Ultimatum")



110. In making the May 6, 2020 Return-to-Work Ultimatum, GLI had no intention of allowing Garltic to return to work.

111. Alternatively, in making the May 6, 2020 Return-to-Work Ultimatum, GLI intended Garltic to return to work while sick with COVID-19.

112. GLI made the May 6, 2020 Return-to-Work Ultimatum in retaliation for Garltic's Learning about Free COVID Test Lie.

113. In making the May 6, 2020 Return-to-Work Ultimatum, GLI made it less likely for employees to take measures to adhere to the Government Mandate.

114. In making the May 6, 2020 Return-to-Work Ultimatum, GLI made it less likely for employees to take measures to stop the spread of COVID-19.

115. The May 6, 2020 Return-to-Work Ultimatum was an adverse action.

116. The May 6, 2020 Return-to-Work Ultimatum was an adverse employment action.

117. GLI made the May 6, 2020 Return-to-Work Ultimatum willfully.

118. GLI made the May 6, 2020 Return-to-Work Ultimatum intentionally.

119. On or about May 8, 2020, Korda called Garltic. ("May 8, 2020 Phone Call")

120. During the May 8, 2020 Phone Call, Korda informed Garltic that she was being terminated. ("Termination")

121. The Termination was an adverse employment action.

122. The Termination was an adverse action.

123. GLI willfully terminated Garltic.

124. GLI intentionally terminated Garltic.

125. GLI has a progressive disciplinary policy.



126. GLI's disciplinary policy calls for escalating levels of discipline for attendance infractions, beginning with a verbal warning, followed by a written warning, and ultimately leading up to termination.

127. Garltic did not receive a verbal warning.

128. Garltic did not receive a written warning.

129. Garltic did not receive a second written warning.

130. By terminating Garltic, GLI violated its own progressive discipline policy.

131. Skipping steps in a progressive discipline policy is an adverse action.

132. Skipping steps in a progressive discipline policy is an adverse employment action.

133. GLI willfully skipped steps in its progressive discipline policy.

134. GLI intentionally skipped steps in its progressive discipline policy.

135. GLI terminated Garltic's employment without just cause.

136. An employer may not terminate an employee when doing so is in violation of public policy.

137. An employer may not terminate an employee when the employee's actions are in line with a clear public policy.

138. An employer may not terminate an employee when doing so would jeopardize a clear public policy.

139. An employer may not terminate an employee if the termination was motivated by conduct related to a clear public policy.

140. An employer may not terminate an employee in violation of public policy when the employer lacks an overriding justification for the dismissal.

141. There is a causal connection between Garltic's Reporting GLI's Unsafe COVID-19 Practices and the Termination.



142. There is a causal connection between Garltic's Refusing to Work While Sick and the Termination.

143. There is a causal connection between Garltic's taking measures to stop the spread of COVID-19 and the Termination.

144. Garltic's Termination was contrary to the Government Mandate.

145. Garltic's Termination was contrary to public policy.

146. Garltic's Termination was in violation of R.C. § 3701.352.

147. As a result of Garltic's Termination, GLI jeopardized the clear public policy that businesses adhere to social distancing and utilize sanitation products whenever possible.

148. As a result of Garltic's Termination, GLI jeopardized the clear public policy that businesses take measures to mitigate the spread of COVID-19.

149. As a result of Garltic's Termination, GLI jeopardized the clear public policy that individuals adhere to the orders of the Ohio Department of Health.

150. GLI lacked an overriding justification for performing Garltic's Termination.

151. The above facts demonstrate that GLI engaged in a pattern and practice of unlawful retaliation.

152. As a direct and proximate result of Defendants' conduct, Garltic has suffered and will continue to suffer damages.

### COUNT I: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

153. Garltic restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

154. GLI's termination of Garltic jeopardizes the clear public policies embodied in the No Mass-Gathering Order.



155. GLI's termination of Garltic jeopardizes the clear public policies embodied in the Government Mandate.

156. GLI's termination of Garltic was motivated by conduct related to these public policies.

157. GLI had no overriding business justification for terminating Garltic.

158. As a result of GLI's wrongful termination of Garltic in violation of public policy, Garltic has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Garltic to injunctive, equitable, and compensatory monetary relief.

159. As a result of GLI's wrongful termination of Garltic in violation of public policy, Garltic has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain suffering.

160. In its discriminatory actions as alleged above, GLI acted with malice or reckless indifference to the rights of Garltic, thereby entitling Garltic to an award of punitive damages.

161. To remedy the violations of the rights of Garltic secured by public policy, Garltic requests that the Court award her the relief demanded below.

## DEMAND FOR RELIEF

WHEREFORE, Garltic demands from GLI the following:

(a) Issue an order requiring Defendants to restore Garltic to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(b) An award against GLI of compensatory and monetary damages to compensate Garltic for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;



(c) An award of punitive damages against GLI in an amount in excess of $25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Garltic claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

Brian D. Spitz (0068816)
Rocco J. Screnci (0100333)
THE SPITZ LAW FIRM, LLC
25200 Chagrin Boulevard, Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax: (216) 291-5744
Email: brian.spitz@spitzlawfirm.com
rocco.screnci@spitzlawfirm.com

*Attorneys For Plaintiff Vanessa Garltic*



## JURY DEMAND

Plaintiff Vanessa Garltic demands a trial by jury by the maximum number of jurors permitted.

Brian D. Spitz (0068816)
Rocco J. Screnci (0100333)

*Attorneys For Plaintiff Vanessa Garltic*

